**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

RYAN DEAN HEATH,

        Defendant.

No. 09-CR-2003-LRR

**SENTENCING**
**MEMORANDUM**

———————————

*TABLE OF CONTENTS*

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     RELEVANT PRIOR PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.    SENTENCING FRAMEWORK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   EVIDENTIARY RULES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

V.    FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
     A.    Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
     B.    B.B., C.E. & K.F. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
     C.    Party. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
     D.    C.E. & K.F. "Make a Private Video". . . . . . . . . . . . . . . . . . . **7**
     E.    Others Observe Sexual Activity . . . . . . . . . . . . . . . . . . . . . . **8**
     F.    B.B., C.E. & K.F. Leave Defendant's Party . . . . . . . . . . . . . **8**
     G.   Defendant Hides Video Camera . . . . . . . . . . . . . . . . . . . . . . **9**
     H.   K.F.'s Recollection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
     I.    C.E.'s Recollection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

VI.   ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

VII.  PRE-DEPARTURE ADJUSTED OFFENSE LEVEL . . . . . . . . . . . . . . . **11**
     A.    Vulnerable Victim Adjustment . . . . . . . . . . . . . . . . . . . . . . **11**
          1.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
          2.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
     B.    Aggravated Role Adjustment . . . . . . . . . . . . . . . . . . . . . . . **15**
          1.    Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
          2.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

C.    *Combined Offense Level* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

VIII. **CRIMINAL HISTORY CATEGORY** . . . . . . . . . . . . . . . . . . . . . . . . **19**
    A.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**
    B.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

IX.   **DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

## *I.  INTRODUCTION*

The matter before the court is the sentencing of Defendant Ryan Dean Heath.

## *II.  RELEVANT PRIOR PROCEEDINGS*

On January 28, 2009, a grand jury returned a two-count indictment ("Indictment") (docket no. 1) against Defendant.  Count 1 charges Defendant with Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a) and (e).[1]  Count 2 charges Defendant with Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).[2]

---

[1] Section 2251(a) provides, in relevant part:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in [. . .] any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce[.]

[2] Section 2252A(a)(5)(B) provides, in relevant part:

> Any person who [. . .] knowingly possesses, or knowingly accesses with intent to view, any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or

(continued...)

On March 30, 2009, Defendant pled guilty to Count 1 of the Indictment before United States Magistrate Judge Jon S. Scoles pursuant to a plea agreement ("Plea Agreement") (docket no. 33-2). That same date, Judge Scoles filed a Report and Recommendation (docket no. 34) in which he recommended that the undersigned accept Defendant's guilty plea.

On July 13, 2009, the United States Probation Office ("USPO") released a draft of Defendant's Presentence Investigation Report ("PSIR"). Both parties lodged objections to the PSIR. On August 18, 2009, the USPO released a revised PSIR.

On September 8, 2009, the government filed its Sentencing Memorandum ("Gov't. Sent. Mem.") (docket no. 49). That same date, Defendant filed his Sentencing Memorandum ("Def. Sent. Mem.") (docket no. 50).

On September 17, 2009, Defendant's attorney, Brent D. Rosenberg, filed a "Motion for Leave to Withdraw as Counsel" ("Motion to Withdraw") (docket no. 53). That same date, the court granted the Motion to Withdraw. On September 25, 2009, attorney Alfred E. Willett filed an appearance on behalf of Defendant.

On October 30, 2009, Defendant filed objections to the PSIR. That same date, Defendant filed a "Motion for Downward Variance from Advisory Guideline Range" ("Motion for Variance") (docket no. 67) and a Sentencing Memorandum (docket no. 69). On November 3, 2009, the USPO issued a Second Revised PSIR. On December 8, 2009, the government filed its Resistance to the Motion for Variance. On December 22, 2009, Defendant filed an "Additional Sentencing Memorandum" (docket no. 83).

On January 7, 2010, the court commenced Defendant's sentencing hearing

---

[2](...continued)
> that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer [. . .] shall be punished as provided in subsection (b).

("Hearing"). Assistant United States Attorney Peter E. Deegan, Jr., represented the government. Attorney Alfred E. Willett represented Defendant, who was personally present. At the Hearing, the court received evidence, heard argument, listened to a statement from a family member of one of the victims and gave Defendant the opportunity to allocute. The court stated that it would issue the instant Sentencing Memorandum to more fully explain its findings on the application of certain provisions of the advisory Sentencing Guidelines.

### III. SENTENCING FRAMEWORK

A "district court should begin [a sentencing proceeding] with a correct calculation of the [defendant's] advisory Sentencing Guidelines range." *United States v. Braggs*, 511 F.3d 808, 812 (8th Cir. 2008). A defendant's Guidelines range "is arrived at after determining the appropriate Guidelines range and evaluating whether any traditional Guidelines departures are warranted." *United States v. Washington*, 515 F.3d 861, 865 (8th Cir. 2008).

"[A]fter giving both parties a chance to argue for the sentence they deem appropriate, the court should consider all of the factors listed in 18 U.S.C. § 3553(a) to determine whether they support the sentence requested by either party." *Braggs*, 511 F.3d at 812. "The district court may not assume that the Guidelines range is reasonable, but instead 'must make an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall v. United States*, 128 S. Ct. 586, 597 (2007)); *see, e.g.*, *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

The district court "has substantial latitude to determine how much weight to give the various factors under § 3553(a)." *United States v. Ruelas-Mendez*, 556 F.3d 655, 657 (8th Cir. 2009); *see also United States v. Feemster*, 572 F.3d 455, 464 (8th Cir. 2009) (en banc) ("'[I]t will be the unusual case when we reverse a district court sentence—whether within, above, or below the applicable Guidelines range—as substantively unreasonable.'"

(quoting *United States v. Gardellini*, 545 F.3d 1089, 1090 (D.C. Cir. 2008)). "If the court determines that a sentence outside of the Guidelines is called for, it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Braggs*, 511 F.3d at 812 (quoting *Gall*, 128 S. Ct. at 597). "The sentence chosen should be adequately explained so as 'to allow for meaningful appellate review and to promote the perception of fair sentencing.'" *Id.*

## IV.  EVIDENTIARY RULES

The court makes findings of fact by a preponderance of the evidence. *See, e.g.*, *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding using a preponderance of the evidence standard is permitted provided that the [Sentencing Guidelines] are applied in an advisory manner."). The court considers a wide variety of evidence, including the undisputed portions of the PSIR, the Plea Agreement, and the testimony and other evidence the parties introduced at the Hearing. The court does not "put on blinders" and only consider the evidence directly underlying Defendant's offenses of conviction. In calculating Defendant's Guidelines range, for example, the court applies the familiar doctrine of relevant conduct. *See* USSG §1B1.3 (2008). The Eighth Circuit Court of Appeals has repeatedly held that a district court may consider uncharged, dismissed and even acquitted conduct at sentencing. *See, e.g.*, *United States v. Whiting*, 522 F.3d 845, 850 (8th Cir. 2008); *United States v. Bradford*, 499 F.3d 910, 922 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 1446 (2008). When relevant and "accompanied by sufficient indicia of reliability to support the conclusion that it [was] probably accurate," the court credits hearsay. *United States v. Sharpfish*, 408 F.3d 507, 511 (8th Cir. 2005).

## V.  FACTS

The court draws the following facts from the uncontested portions of the PSIR, the

Plea Agreement and the evidence presented at the Hearing:[3]

### A. Defendant

Defendant is 29 years old. At all times relevant to the instant Sentencing Memorandum, Defendant resided at 1402 Cottage Row Road in Cedar Falls, Iowa.

### B. B.B., C.E. & K.F.

B.B., C.E. and K.F. are females who, at all times relevant to the instant Sentencing Memorandum, resided in a small town approximately 10 to 15 miles outside of Cedar Falls. At the time Defendant committed the underlying offense, B.B. was fourteen years old, C.E. was fifteen years old and K.F. was seventeen years old.

### C. Party

On April 21, 2007, Defendant hosted a party at his residence. That night, B.B., C.E. and K.F. met some friends at a restaurant and decided to attend Defendant's party. Prior to attending the party, BB., C.E. and K.F. "were drinking out of a bottle of UV (a blue vodka)" in a car. PSIR at ¶ 22. The girls had finished three-quarters of the bottle of vodka by the end of the evening.

The party lasted into the early morning hours of the following day. There was alcohol at the party.[4] At the party, C.E. drank beer and K.F. drank beer and vodka with orange juice. K.F. was more intoxicated than C.E.

At the Hearing, C.E. and K.F. testified that they had not misrepresented their age to anyone at the party. K.F. testified that she told a group of people that she was 21 years of age; however, she considered this statement to be a joke. K.F. believes that the partygoers understood her statement to be a joke, because they laughed in response to her statement. Defendant was present while this conversation occurred. It is unclear whether

---

[3] The court makes additional factual findings in conjunction with its conclusions of law.

[4] It is unclear who provided the alcohol at the party.

Defendant spoke to C.E. or K.F. about their age. To the extent it is relevant, the court finds the testimony of C.E. and K.F. to be credible. That is, the court finds that neither C.E. nor K.F. misrepresented their age at the party. Any statement made by C.E. or K.F. that they were 21 years of age was understood by others as a joke.

### D. C.E. & K.F. "Make a Private Video"

Near a bonfire at Defendant's residence, C.E. and K.F. began kissing each other. An adult male[5] approached C.E. and K.F. and offered to pay them $100 "to go inside and make a private video."[6] *Id.* at ¶ 17. C.E. and K.F. went into Defendant's house. B.B. was unable to enter Defendant's house because the doors were locked.

C.E. and K.F. entered one of the bedrooms. Defendant, Jamie Farnsworth, Vaughn Anderson, Aaron Bush and Ryan Miller were also present in the bedroom. C.E. and K.F. were "completely naked from the waist down." *Id.* at ¶ 24. C.E. and K.F. performed oral sex on each other for approximately five to ten minutes while Defendant recorded them with a video camera. Defendant instructed C.E. and K.F. to perform sexual acts while he filmed them.

Then, Defendant handed the video camera to Anderson. Anderson continued to record while Ryan Miller performed oral sex on C.E. and Defendant had vaginal intercourse with K.F.[7] Defendant had vaginal intercourse with K.F. for approximately

---

[5] It is unclear whether this individual was Defendant or another adult male. C.E. and two other witnesses, David Maxson and Jamie Farnsworth, believe that Defendant solicited K.F. and C.E. However, K.F. could not recall who solicited her.

[6] Jeremiah Aneweer, an adult male who attended the party, gave law enforcement a video clip he had recorded with his cellular telephone. The video showed C.E. and K.F. standing in a group of people at Defendant's party near the bonfire. In the video, one of the girls "repeatedly kisses the exposed breast of the other." PSIR at ¶ 31. A male voice in the background says, "I've got $100 for each of you to make a private video." *Id.*

[7] Bush, Miller and Aneweer recalled that Defendant also performed oral sex on

(continued...)

five to seven minutes. Then, K.F. asked Defendant to stop. Defendant stopped "and [K.F.] seemed upset;" however, Defendant resumed intercourse and stopped after he "finished or ejaculated." *Id.* at ¶ 27. Then, K.F. went into the bathroom crying. Miller recalled that K.F. was "very distraught" and "very upset." *Id.*

Defendant gathered all the males in the bedroom together and told them "he had just ejaculated inside of K.F." and "was concerned." *Id.* at ¶ 28. Defendant did not want anyone to leave his house "until everyone could be calmed down." *Id.*

### E. Others Observe Sexual Activity

While C.E. and K.F. were in Defendant's house, some partygoers were on the balcony of Defendant's house and tried to look inside his windows to observe the sexual activity. One of these observers "said that one of the girls [understood to be C.E. or K.F.] said 'no' and the guys got mad." *Id.* at ¶ 17.

David Maxson observed the sexual activity from Defendant's balcony. Maxson stated that he observed one of the girls "tr[y] to run out of the bedroom, but one of the people in the residence blocked the door." *Id.* at ¶ 32. Maxson also observed "one of the girls in a towel crying." *Id.*

Aneweer also observed the sexual activity from the balcony of Defendant's house. Aneweer recorded part of the sexual activity with a cellular telephone. Aneweer gave law enforcement a copy of this recording. The recording "show[s] a male inside the room holding what appears to be a video camera." *Id.* at ¶ 30. Aneweer identified Defendant as the individual engaged in sexual activity with K.F. in the video.

### F. B.B., C.E. & K.F. Leave Defendant's Party

Around midnight, one of the males in Defendant's house walked outside, announced that the party was over and instructed the partygoers to go home. C.E. and K.F. were still

---

[7](…continued)
K.F. Aneweer also told law enforcement that he saw Defendant digitally penetrate K.F.

in Defendant's house.  B.B. placed a telephone call to her sixteen-year-old sister to ask for help.  B.B. left the party to meet her sister.  When B.B. and her sister returned to the party, they called out to C.E.  C.E. left Defendant's house unassisted.  C.E. was not wearing her undershirt.  After C.E. had entered the vehicle of B.B.'s sister, C.E. asked B.B., "how old was the guy that ate me?"  *Id.* at ¶ 18.  The court understands this to be a reference to oral sex.

B.B.'s sister entered Defendant's house to find K.F.  B.B.'s sister believed that B.B. had called and asked for her assistance "because K.F. was too drunk to make it out of the house on her own."  *Id.* at ¶ 20.  B.B.'s sister found K.F. on the toilet in Defendant's bathroom.  K.F.'s pants were down, her brassiere was on the floor and her shirt was disheveled.  B.B.'s sister helped K.F. dress and assisted K.F. to the vehicle.  B.B. recalled that K.F.'s shirt "was falling off" and that K.F. "kept throwing up."  *Id.* at ¶ 19.

### G.  *Defendant Hides the Video Camera*

After C.E. and K.F. left Defendant's house, Defendant instructed Farnsworth, Anderson, Bush and Miller to follow him.  Defendant took the group to the second level of the "old A-1 Vacationland in Cedar Falls."  *Id.* at ¶ 29.  Defendant placed the video camera that he had used to record C.E. and K.F. above a ceiling tile.  Defendant removed a handgun from the ceiling.  Defendant stated that "the gun belonged to a former Cedar Falls, Iowa, police officer."  *Id.*  The group left the building and later separated.

### H.  *K.F.'s Recollection*

After the incident, K.F. gave a statement to law enforcement and testified at Defendant's probation revocation hearing.  K.F. also testified before the grand jury.  K.F. recalled that someone at the party named "Jameson"[8] gave her a glass of orange juice and vodka.  *Id.* at ¶ 21.  K.F. also recalled that someone had offered her $100 to go into

_____

[8] Jamie Farnsworth is also known as "Jameson."  *Id.* at ¶ 21, n.2.

Defendant's house to "make a private video." *Id.* K.F. remembered being inside Defendant's house in a room with C.E. and two individuals named "Ryan" and an individual named "Farnsworth." *Id.* K.F. remembered seeing a red light that indicated someone was recording. K.F. described her condition as "blacked out." *Id.*

### I. C.E.'s Recollection

C.E. also gave a statement to law enforcement and testified at Defendant's probation revocation hearing. C.E. also testified before the grand jury. C.E. recalled that she, K.F. and B.B. drank three-quarters of a bottle of vodka in a car prior to attending the party. C.E. recalled that someone gave K.F. a glass of orange juice and vodka at the party.[9] C.E. recalled that "she had a sip of beer at the party," but then vomited. *Id.* at ¶ 22.

C.E. stated that Defendant offered to pay her and K.F. $100 to make a "private movie." *Id.* C.E. recalled that, at the time of the offer, she and K.F. "were kissing each other by the bonfire." *Id.*

C.E. remembered that, after she and K.F. had entered Defendant's house, they "were performing oral sex on each other on a bed while a male was video recording the activity." *Id.* C.E. thought that Defendant was recording them. C.E. recalled that, at some point, "the two Ryans joined in the sexual activity while another male continued video recording the activity." *Id.* More specifically, C.E. recalled that Ryan Miller began performing oral sex on her and that Defendant began having intercourse with K.F.

C.E. stated that, after the incident, K.F. cried in Defendant's bathroom and stated that "her boyfriend would be mad at her." *Id.* C.E. also remembered that one of the males who had been in the room told them that the video recording "had been destroyed." *Id.*

---

[9] At Defendant's probation revocation hearing, C.E. testified that Defendant had given K.F. some alcohol at the party, which conflicts with K.F.'s testimony that she had received alcohol from Jameson.

## VI.  ISSUES

The contested issues discussed in the Order are whether the court should: (1) apply a two-level vulnerable victim upward adjustment pursuant to USSG §3A1.1(b)(1); (2) apply an aggravated role upward adjustment pursuant to USSG §3B1.1(a); and (3) assess one or three criminal history points for the revocation of Defendant's probation on April 9, 2008.  The other issues in Defendant's sentencing are not discussed in this Sentencing Memorandum.  The government bears the burden of proof on these issues.  *See United States v. Flores*, 362 F.3d 1030, 1037 (8th Cir. 2001) (stating that the government bears the burden to prove sentencing enhancements).

## VII.  PRE-DEPARTURE ADJUSTED OFFENSE LEVEL

The parties agree that USSG §2G2.1 applies in the instant sentencing.  The Special Instruction in this provision states: "If the offense involved the exploitation of more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the exploitation of each minor had been contained in a separate count of conviction."  USSG §2G2.1(d)(1).  The instant action involves two minor victims, C.E. and K.F.  Accordingly, the court calculates the Guidelines sentence with respect to both victims.

The parties agree that Defendant's base offense level for both victims is **32**.  USSG §2G2.1(a).  With respect to C.E., the parties also agree that Defendant is subject to: (1) a **two-level** upward adjustment pursuant to USSG §2G2.1(b)(1)(B) because the offense involved a minor who had attained the age of twelve years but not attained the age of sixteen years; and (2)  a **two-level** upward adjustment pursuant to USSG §2G2.1(b)(2)(A) because the offense involved the commission of a sexual act or sexual contact.  This brings Defendant's offense level for C.E. to **36**.

With respect to K.F., the parties agree that Defendant is subject to a **two-level** upward adjustment pursuant to USSG §2G2.1(b)(2)(A) because the offense involved the commission of a sexual act or sexual contact.  This brings Defendant's offense level for K.F. to **34**.

### A. Vulnerable Victim Adjustment

The parties dispute whether the court should apply a two-level vulnerable victim upward adjustment pursuant to USSG §3A1.1(b)(1) for both K.F. and C.E. "[A] district court should apply a two-level enhancement to [a] defendant's offense level 'if the defendant knew or should have known that a victim of the offense was a vulnerable victim.'" *United States v. Starr*, 533 F.3d 985, 1002 (8th Cir. 2008) (quoting USSG §3A1.1(b)(1) (cmt.) n.2). A "'vulnerable victim' means a person (A) who is a victim of the offense of conviction [. . .] and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG §3A1.1 (cmt.) n.2. This enhancement "applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's vulnerability." *Id.* "However, [a] court should not 'apply [the vulnerable victim enhancement] if the factor that makes the person a vulnerable victim is incorporated in the offense guideline.'" *Starr*, 533 F.3d at 1002 (quoting USSG §3A1.1 (cmt.) n.2). In other words, the fact that age made C.E. and K.F. vulnerable should not factor into the court's application of this enhancement. *Id.*

### 1. Analysis

The court finds that Defendant knew or should have known that K.F. and C.E. were intoxicated. K.F. and C.E. arrived at Defendant's party after consuming a large amount of vodka. K.F. and C.E. continued to drink at Defendant's party. At the party, K.F. and C.E. vomited because they had consumed too much alcohol.

The court turns to consider the second aspect of the vulnerable victim enhancement—whether K.F. and C.E.'s consumption of alcohol made them "vulnerable" victims. The government argues that the vulnerable victim enhancement should apply because the victims "were drunk at the time of the offense" and because their condition "rendered them unusually susceptible to [D]efendant's efforts to sexually exploit them on film." Gov't Sent. Mem. at 4 (internal quotation marks omitted).

A victim's consumption of alcohol is not, by itself, enough to qualify a victim as vulnerable. Some other factor, such as limited consciousness or other physical or mental incapacity, is typically required. *See United States v. Swallow*, 193 F. App'x 646, 647 (8th Cir. 2006) (affirming application of enhancement when the defendant engaged in sex acts with victim whom he knew had passed out from drinking alcohol); *United States v. Iron Cloud*, 312 F.3d 379, 382 (8th Cir. 2002) (noting proper application of vulnerable victim enhancement when the victim was intoxicated and in a "limited state of consciousness"); *United States v. Evans*, 272 F.3d 1069, 1091 (8th Cir. 2001) (affirming application of enhancement when the defendant met the victim while the victim was incarcerated and addicted to drugs and alcohol, picked the victim up upon her release from prison and furnished her with alcohol and drugs); *United States v. Eagle*, 293 F. App'x 506, 507 (9th Cir. 2008) (affirming application of enhancement because the defendant provided a fourteen-year-old victim with alcohol "to the point of intoxication[] and had intercourse with her after she had passed out"); *United States v. Crudden*, 1996 WL 19195, No. 94-30349, *1 (9th Cir. Jan. 18, 1996) (affirming application of enhancement when victim "was intoxicated and sleeping at the time of the sexual abuse").

The court is unpersuaded that the victims were in a limited state of consciousness or were otherwise vulnerable. First, the court examines K.F.'s conduct. K.F. described her condition on the night in question as "blacked out" and could not recall certain events that transpired at Defendant's party. PSIR at ¶ 21. However, at Defendant's revocation hearing, K.F. recalled important, specific information that related directly to the offense. K.F. recalled (1) that she consumed alcohol at Defendant's party; (2) that she received alcohol from someone named "Jameson," who attended the party; (3) being offered $100 to make a "private video" in Defendant's house; (4) being in a bedroom with C.E., two men named "Ryan" and a man named "Farnsworth"; and (5) observing a red light that "indicat[ed] that someone may have been recording." *Id.*

The fact that K.F. was conscious, coherent and had clear control over her motor

functions also show that she was not a vulnerable victim. For instance, at the time Defendant solicited K.F., she was kissing C.E. by the bonfire. K.F. engaged in oral sex with C.E. While Defendant was having intercourse with K.F., she asked him to stop. Immediately after he stopped, K.F. "ran" to the bathroom. PSIR at ¶ 27. K.F. was also coherent enough to understand the nature of what had happened, as evidenced by the fact that she told B.B. that her boyfriend would be angry with her about the incident. Although K.F.'s consumption of alcohol may have affected her inhibitions, it did not make her a "vulnerable" victim as defined by §3A1.1.[10]

The same is true with respect to C.E. C.E. was less intoxicated than K.F. and recalled much more of the incident than K.F. For example, C.E. recalled that she had received alcohol at the party and went to the bedroom with K.F. and several men. C.E. also recalled seeing K.F. naked with a man on top of her. C.E.'s conduct also suggests that her consumption of alcohol did not make her vulnerable. For instance, C.E. asked B.B. and B.B.'s sister about the age of the man who had performed oral sex on her. C.E. was also able to leave Defendant's house without assistance when B.B. and B.B.'s sister called for her.

The government suggests that the fact that C.E. and K.F. were "young girls in an unfamiliar atmosphere" tends to show that they are vulnerable victims. For purposes of the instant Sentencing Memorandum, the court disagrees. First, the age of the victims has been taken into consideration as a specific offense characteristic in §2G2.1. Therefore, the court cannot consider their age as a factor that makes them "vulnerable" under §3A1.1. "A court should not 'apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated in the offense guideline.'" *Starr*, 533 F.3d at 1002 (quoting USSG

---

[10] The government also suggests that the fact K.F. was partially undressed and that B.B.'s sister helped K.F. dress demonstrate her vulnerability. It is unclear to the court whether K.F. was having difficulty dressing because she was drunk or because she was overcome by the realization of what had just transpired.

§3A1.1). The court recognizes, however, that if the age of the victims had not been previously considered as a specific offense characteristic, it would have certainly weighed in favor of finding that the victims were vulnerable.

Second, the court is unpersuaded that the fact the girls were ten to fifteen miles away from home made them "vulnerable" victims. If that were the case, then any person who was victimized in an unfamiliar location would be more likely to be a "vulnerable" victim. Further, the government cites no authority in support of this position.

### 2. Conclusion

The court finds that the government has failed to show by a preponderance of the evidence that the vulnerable victim enhancement in §3A1.1 should apply to either victim.[11] Accordingly, the court shall not apply this enhancement. However, the court shall take the facts discussed in this section into account when it decides where to sentence Defendant within the advisory Sentencing Guidelines range.

### B. Aggravated Role Adjustment

The parties dispute whether the court should apply a four-level aggravated role upward adjustment in USSG §3B1.1(a). Section 3B1.1 provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

---

[11] The court notes that, if it erred with respect to the application of the vulnerable victim enhancement as to K.F., Defendant would have nevertheless had the same offense level due to the combined offense level provision in USSG §3D1.4. *See* Section VII.C.

> (c)    If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

USSG §3B1.1 (emphases in original). The commentary to this provision provides:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing an offense.

*Id.* (cmt.) n.4. The Guidelines define a "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* (cmt.) n.1.

### 1.    *Analysis*

The government argues that the court should apply a four-level upward adjustment pursuant to §3B1.1(a) because Defendant "was an 'organizer' of the criminal activity in that he put all of the persons and pieces in place for the offense to actually be committed." Gov't Sent. Mem. at 9. The government argues that the following factors support the application of the §3B1.1(a) enhancement: (1) Defendant hosted the party where the offense occurred; (2) Defendant provided alcohol to K.F.; (3) Defendant filmed K.F. and C.E. while they performed oral sex on each other; (4) Defendant engaged in sexual intercourse with K.F. while Anderson filmed them; (5) the illegal conduct occurred inside Defendant's house; (6) Defendant instructed C.E. and K.F. to perform sexual acts; (7) Defendant handed the video camera to Anderson; (8) Farnsworth and Bush were present

while the filming took place; (9) after K.F. left the bedroom, Defendant spoke to all the men present and informed them that he was concerned because he had ejaculated into K.F. and did not want anyone to leave until they had been calmed; (10) the doors to Defendant's residence were locked when the offense occurred; and (11) after the offense, Defendant instructed the men who were present to follow him, brought them to A-1 Vacationland and hid the video camera.[12]

The court disagrees with the government's characterization that there were five or more participants in the offense. There were seven individuals present at the time of the offense: Defendant, Anderson, Bush, Miller, Farnsworth, C.E. and K.F. Only three of these individuals "participated" in the offense.

First, the two victims could not "participate" in the offense. The court recognizes that Defendant instructed them to perform sexual acts during the filming. However, this does not constitute "leading" under §3B1.1 because victims have no criminal responsibility for the commission of the offense and therefore cannot be participants. *See* USSG §3B1.1 (cmt.) n.1 ("A person who is not criminally responsible for the commission of the offense [. . .] is not a participant.").

Second, two of the men who were present, Bush and Farnsworth, had no involvement in the commission of the offense. They merely witnessed it. Accordingly, the court finds that Defendant did not "lead" Bush and Farnsworth in the commission of the offense. This decreases the number of purported "participants" to three individuals:

---

[12] The government also insists that Defendant provided the video equipment. However, because the PSIR contains no information about who provided the video equipment, the court does not make this finding of fact. The government also cites to the PSIR and argues that Defendant had the idea to film the sexual conduct and solicited K.F. and C.E. The court recognizes that portions of the PSIR suggest that Defendant took both of these actions; however, the PSIR also contains contradictory evidence on these points. Because these facts cannot be established by a preponderance of the evidence, the court declines to find that Defendant either (1) conceived of the idea to film the girls or (2) solicited the girls to make a "private video."

Defendant, Miller and Anderson.  Accordingly, the enhancements in §3B1.1(a) and (b), which requires "five or more participants," cannot apply.  USSG §3B1.1(a).

The court proceeds to determine whether, alternatively, the enhancement in §3B1.1(c) applies.  This section provides for a 2-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)."  USSG §3B1.1(c).  The court finds that Defendant did not organize, lead, manage or supervise the commission of the offense with respect to Miller and Anderson.

The court finds that Defendant, Miller and Anderson had relatively equal roles in the offense.  Like Defendant, Miller performed sex acts on one of the victims during the filming of the offense.  Defendant did not ask or instruct Miller to perform oral sex on C.E.  Miller performed these acts at his own volition.  Similarly, Anderson had a key role in the offense because he filmed a great deal of the sexual activity.  The court recognizes that Defendant handed Anderson the camera; however, Defendant did not instruct or ask Anderson to continue filming.  Instead, Anderson continued filming at his own initiative. The court concludes that Defendant did not lead Anderson and Miller in the commission of the offense.  The court also finds that the spontaneity of the offense weighs against the application of this enhancement.  Defendant and his friends clearly did not premeditate or plan the offense.

The court also concludes that Defendant did not lead Anderson and Miller after the commission of the offense.  Defendant gathered the group of men in the bedroom and told them he had ejaculated into K.F. and asked them to accompany him to A-1 Vacationland. However, Defendant did not direct them to engage in any criminal activity or instruct his friends to hide the video camera in the ceiling.

### 2.    *Conclusion*

In light of the foregoing, the court concludes that the government has failed to show that Defendant was a leader in the commission of the underlying offense by a preponderance of the evidence.  Accordingly, the court declines to apply any aggravating

role enhancement in §3B1.1. However, the court shall consider the facts discussed in this section when it decides where to sentence Defendant within the Advisory Sentencing Guidelines range.

## C. Combined Offense Level

With respect to C.E., Defendant has an adjusted offense level of **36**. With respect to K.F., Defendant has an offense level of **34**. Section 3D1.4 requires the court to "tak[e] the offense level applicable to [. . .] the highest offense level and increas[e] that offense level by the amount" stated in the table in Section 3D1.4. USSG §3D1.4. Accordingly, the court uses C.E.'s offense level, **36**, as the basis for the combined offense level.

The parties do not dispute that Defendant should be assessed with two units under §3D1.4. This brings Defendant's adjusted offense level to **38**. As stated at the Hearing, the court has not yet determined whether Defendant is entitled to a two-level reduction for acceptance of responsibility under USSG §3E1.1(a) or a one-level reduction under §3E1.1(b).

## VIII. CRIMINAL HISTORY CATEGORY

The PSIR states Defendant is Criminal History Category **IV**. In arriving at this conclusion, the USPO assessed Defendant with a total of eight criminal history category points. The USPO assessed three of these criminal history category points because the Iowa District Court for Black Hawk County revoked Defendant's probation in *Iowa v. Heath*, no. FECR137963 ("state court case"). On February 21, 2006, law enforcement arrested Defendant in the state court case for three charges: (1) "Assault Use/Display of a Weapon;" (2) "Assault With Weapon—Peace Officers/Others;" and (3) "Interference With Official Acts, Dangerous Weapon or Firearm." PSIR at ¶ 69. On September 18, 2006, the Iowa District Court sentenced Defendant in the state court case to a suspended two-year sentence and two years of probation.

On April 9, 2008, as a result of Defendant's commission of the underlying offense, the Iowa District Court revoked his probation in the state court case and required

Defendant to serve the previously-suspended two-year sentence. Defendant argues that the bar against impermissible double-counting requires the court to assess him with only one criminal history point for the revocation in the state court case, not three. If Defendant received only one criminal history point for this offense, he would be Criminal History Category III rather than Criminal History Category IV.

### A. Analysis

Defendant argues that if the court assesses two additional criminal history category points due to the Iowa District Court's revocation of his probation in the state court case, "the practical effect is to double count the [criminal history] points." Def. Sent. Mem. at 5. Generally, a court "[a]dd[s] **3** points for each prior sentence of imprisonment exceeding one year and one month, [. . .] **2** points for each prior sentence of imprisonment of at least sixty days," and "**1** point for each prior sentence" not otherwise counted "up to a total of **4** points[.]" USSG §4A1.1(a)-(c).

Revocations of parole are governed by USSG §4A1.2(k), which provides: "In the case of a prior revocation of probation, parole, supervised release, special parole, or mandatory release, add the original term of imprisonment imposed upon revocation." USSG §4A1.2(k)(1). The court uses the "resulting total [. . .] to compute the criminal history points." *Id.* "Rather than count the original sentence and the resentence after revocation as separate sentences, the sentence given upon revocation should be added to the original sentence of imprisonment, if any, and the total should be counted as if it were one sentence." *Id.* at (cmt.) n.11. "By this approach, no more than three points will be assessed for a single conviction, even if probation or conditional release was subsequently revoked." *Id.* at n.11.

The Guidelines provide no direction in a case such as the instant action, in which the offense conduct for the underlying federal offense is the same conduct upon which a state court bases a revocation of parole. Case law indicates, however, that it is appropriate to assess a total of three points—not just one point—for such a revocation:

> [The instant argument] ignores the relation-back aspect of the law—incarceration resulting from a probation revocation is punishment for the original offense. It is imposed as a consequence of the defendant's breach of probation terms but is not punishment for the breach.

*United States v. Dozier*, 555 F.3d 1136, 1140 (10th Cir. 2009) (citing *Alabama v. Shelton*, 535 U.S. 654, 662 (2002) ("A suspended sentence is a prison term imposed for the offense of conviction. Once the prison term is triggered, the defendant is incarcerated not for the probation violation, but for the underlying offense.").

In the instant sentencing, the sentence imposed as a result of the revocation in the state court case was a consequence of Defendant's state assault charge in 2006, which is not part of the instant child exploitation charge. "Where probation is revoked based on the same conduct forming the basis of a federal offense, the imposition of the original sentence is attributable to the original act of conviction," that is, Defendant's assault charge in 2006, "not the act underlying the revocation," that is, the instant child exploitation charges. *Id.* at 1141. *See also United States v. Wheeler*, 330 F.3d 407, 412 (6th Cir. 2003) (concluding district court had properly considered the sentence imposed following the defendant's revocation of his state court sentence despite the fact that the revocation arose from the same conduct underlying the federal offense).

### B. Conclusion

In light of the foregoing, the court concludes that the USPO properly assessed a total of three criminal history points for the revocation of Defendant's parole in the state court case. Accordingly, the court counts a total of **8** criminal history points against Defendant. Defendant is Criminal History Category **IV.** USSG Ch. 5 Pt. A.

## IX. DISPOSITION

The court shall resume the Hearing at a date and time to be determined under separate cover. At the Hearing, the court shall impose sentence in a manner consistent with the instant Sentencing Memorandum.

**IT IS SO ORDERED.**

**DATED** this 11th day of January, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA